**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICTOF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Anthony Johnson, | ) | |
| | ) | Case No. 12 CV 9225 |
| | ) | |
| Plaintiff, | ) | Judge Martha M. Pacold |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| Officer Perez, #10546, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF ANTHONY JOHNSON'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION**
**<u>FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................4

INTRODUCTION ...........................................................................................................5

SUMMARY OF FACTS ..................................................................................................5

    Johnson's Neighborhood Car Service..........................................................................6

    The Incident ...............................................................................................................6

    The Interrogation .......................................................................................................7

    Plaintiff's Asserted Gang Affiliation .........................................................................8

    CPD Did This..............................................................................................................9

    The Appellate Court Decision ....................................................................................9

ARGUMENT ................................................................................................................14

SUMMARY JUDGMENT STANDARD ..........................................................................14

    I.     FALSE ARREST CLAIM ................................................................................14

    II.    DEFENDANTS' SUMMARY JUDGMENT MOTION ON PLAINTIFF'S
          MALICIOUS PROSECUTION CLAIM SHOULD BE DENIED........................14

          A.    There Is A Fact Issue Regarding Probable Cause.....................................14

          B.    Any Presumption Of Probable Cause From Johnson's Indictment
               Rebutted ..................................................................................................17

          C.    There Is A Fact Issue Regarding Proximate Cause ...................................18

          D.    There Is A Fact Issue Regarding Malice....................................................19

          E.    Qualified Immunity Does Not Bar Johnson's Claim..................................20

          F.    The Illinois Tort Immunity Act Does Not Apply ......................................21

          G.    Officer Perez ...........................................................................................21

    III.   SUMMARY JUDGMENT SHOULD BE DENIED REGARDING
          THE EQUAL PROTECTION CLAIM ..............................................................21

    IV.   THE HATE CRIME CLAIM...............................................................................24

    V.    SUMMARY JUDGMENT SHOULD BE DENIED REGARDING
          THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM ....24

    VI.   THE UNKNOWN DETECTIVE/OFFICER JANE DOE AND
          UNKNOWN DETECTIVE/OFFICER JOHN DOE DEFENDANATS ...............25

VII.     SUMMARY JUDGMENT SHOULD BE DENIED REGARDING
         THE *RESPONDEAT SUPERIOR* AND INDEMNITY CLAIMS........................25

CONCLUSION.......................................................................................................................25

CERTIFICATE OF SERVICE ...............................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. City of Danville, Illinois*, No. 18-2290, 2022 WL 1321291 (C.D. Ill. May 3, 2022) .. 22

*Amos v. City of Chicago*, No. 22 C 1564, 2024 WL 640860 (N.D. Ill. Feb. 15, 2024) ... 11, 12, 13, 18

*Chavez v. Ill, State Police*, 251 F.3d 612 (7th Cir. 2001) .......................................................... 20

*Gauger v. Hendle*, 2011 IL App (2d) 100316, 954 N.E.2d 307 (Ill. App. Ct. 2011) ................. 17

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) ........................................................................ 16

*Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018) ..................................................................... 11

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ............................................................................... 15

*Larsen v Elk Grove Village*, 433 Fed.Appx. 470 (7th Cir. 2011) ............................................... 22

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) ...................................................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................ 11

*McDade v. Stacker*, 106 Fed.Appx. 471 (7th Cir. 2004) ........................................................... 22

*People v. Dennis,* 181 Ill.2d 87, 692 N.E.2d 325 (Ill. 1998) ...................................................... 12

*People v. Fernandez*, 2014 IL 115527, 6 N.E.3d 145 (Ill. 2014) ............................................... 12

*People v. Lee*, 214 Ill.2d 476, 828 N.E.2d 237 (Ill. 2005) .......................................................... 12

*People v. Perez*, 189 Ill.2d 254, 725 N.E.2d 1258 (Ill. 2000) ................................................... 12

*People v. Taylor*, 186 Ill.2d 439, 712 N.E.2d 326 (Ill. 1999) .................................................... 12

*Phillips v. Allen*, 668 F.3d 912 (7th Cir. 2012) .......................................................................... 12

*Pierner-Lytge v. Hobbs*, 60 F.4th 1039 (7th Cir. 2023) ............................................................. 12

*Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2019) .......................................................... 15, 18

*Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757 (7th Cir. 2021) ..................................... 12

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ....................................................................... 16

*Torres v. City of Chicago*, 123 F.Supp.2d 1130 (N.D. Ill. 2000) .............................................. 23

*Whitlock v. Brown*, 696 F.3d 406 (7th Cir. 2010) ...................................................................... 18

## INTRODUCTION

In May 2012, Anthony Johnson was 26 years old. After graduating from high school, he obtained a certification in auto mechanics. While he looked for work as a mechanic, he gave people rides in his car for money. On May 10, 2012, Tywan Mason paid him $10.00 for a ride. Mason directed Johnson as to where to go. Those directions lead Johnson to the corner of 54th and Hoyne. There, without any prior knowledge or involvement by Johnson, Mason shot and killed two men.

It turned out that Mason was in an African American street gang called the Vice Lords. His victims, also African American, were members of the Gangster Disciples. Shortly after these shootings, Johnson was arrested. The moments before his arrest were Johnson's last taste of freedom for nine years.

Johnson was charged with murder on and accountability theory. He was convicted and sent to prison for life. While in prison, his appeal was heard and it succeeded. The Illinois Court of Appeals' opinion explaining why Johnson's convictions were reversed is remarkable. The Court effectively determined that Johnson should never have been tried for these crimes.

Now, the Police Officers who caused Johnson to be prosecuted and their employer, the City of Chicago, seek to avoid a trial. But, their summary judgment motion lacks merit. It should fail in the face of the factual disputes that bar it. Defendants' summary judgment motion should be dismissed.

## SUMMARY OF FACTS

Defendants have filed an oversized brief and Local Rule 56.1 Statement of Facts. The record filed in support of the motion consists of hundreds of pages and 90 exhibits. Despite this, Defendants omit a substantial number of material facts. The omitted facts controvert key elements of Defendants' factual showing. These important facts are summarized below.

**Johnson's Neighborhood Car Service**

Anthony Johnson testified extensively about the car service he operated in 2012. (Plaintiff's Statement of Additional Material Facts ("Pl. SOF") ¶ 6). The service he supplied was similar to what years later would be Uber or Lyft, but without an app. He was known in the neighborhood as somebody who would supply transportation for payment. (Pl. SOF ¶ 6). He took people where they needed to go, such as to the store or to the laundromat. (Pl. SOF ¶ 7). In return, he and the riders agreed to amounts for payment, which he received in cash. (Pl. SOF ¶ 7).

The record does not reflect Johnson giving rides to any alleged gang members other than Bo Mason.

**The Incident**

The following are key facts not related by Defendants. First, Johnson, whom Defendants describe as having been "chubby," always drove with his seat back. (Plaintiff's Response to Defendants' Statement of Material Facts ("Def. SOF") ¶ 74). This helps to refute Defendants' suggestion that Anthony Johnson moved his seat back to permit Mason to fire at Mason's victims. (Doc. # 251 at p. 9). This evidence is uncontroverted.

Second, Defendants claim that Johnson opened his car window just prior to the shooting. No evidence of this is supplied. (*See* Doc. # 251 at p. 15). However, Johnson testifies that he was driving with the window open all along. (Pl. SOF ¶ 8). This is credible given the weather that day. Temperatures were between 62 and 64 degrees at the time of the shooting. (*See Past Weather in Chicago, Illinois, USA – May 2012*, Time and Date, https://www.timeanddate.com/weather/usa/chicago/historic?month=5&year=2012, last accessed Aug. 26, 2024; *see also* Pl. SOF ¶ 27).[1] This testimony is uncontroverted.

---

[1] The Court can take judicial notice of this fact pursuant to F.R.Evid. 201 (b).

Third, Johnson testified that after the shooting, Mason was holding the gun he had just used to commit two murders. (Def. SOF ¶ 10). Johnson testified that he was afraid for his life. (Def. SOF ¶ 10). This was the situation when Mason got out of the car on Damen. This testimony is uncontroverted.

Fourth, Johnson explained why he did not call 911 immediately. He was scared. (Def. SOF ¶ 10). His cousin worked in a law office and was expected home shortly. (Def. SOF ¶ 10). He wanted to talk to her about what he should do. (Def. SOF ¶ 10). This testimony is uncontroverted.

Fifth, during a consensual search of Johnson's home, two guns were found. (Def. SOF ¶ 20). Defendants, however, neglect to mention that the black colored gun was a revolver and that it was utterly inoperable. (Def. SOF ¶ 34). They also do not relate the uncontroverted fact that neither gun had been fired. (Def. SOF ¶ 34). They omit the fact that based on evidence from the scene, particularly shell casings, the police knew that neither gun could have been used in the shooting. (Def. SOF ¶ 34). Defendants neglect to mention that Johnson had a FOID card for the operable weapon. (Pl. SOF ¶ 9). These facts are uncontroverted.

### The Interrogation

The CPD interrogated Johnson well into the early morning of May 11, 2012. (Def. SOF ¶ 58). Sleep deprivation is a known interrogation technique. It is also highly improper. (Steven J. Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn, *Sleep Deprivation and False Confessions,* PSYCHOLOGICAL AND COGNITIVE SCIENCES, Feb. 23, 2016, https://www.pnas.org/doi/epdf/10.1073/pnas.1521518113) (linking sleep deprivation to false confessions). Yet, Defendants establish that Johnson's interrogation mostly happened over the time period from 12:17 a.m. to 2:06 a.m. (Def. SOF ¶ 58). These facts are uncontroverted.

Furthermore, Defendants admit that Johnson consented to a search of his cell phone. (Def. SOF ¶ 81). Also, his Grandmother and Aunt consented to a search of his room. (Def. SOF ¶ 33). This is where the two guns, which are not relevant to this case, were found. (Def. SOF ¶ 34). These facts are not controverted.

### Plaintiff's Asserted Gang Affiliation

The very first sentence of Defendants' Summary of Facts addresses the issue of gangs. This begins the process of trying to tie Johnson into a gang. However, there is no evidence that he was in one. Rather, Defendants play on a stereotype that young African American men are gang members.

In fact, the Chicago Police Department has a database where information regarding gang affiliation and activities is stored. (Pl. SOF ¶ 11). This information can be seen in various police records involving other people involved in this case, such Mason. (Pl. SOF ¶ 12). However, Anthony Johnson's record reflects no gang affiliation. (Pl. SOF ¶ 12). Obviously, nobody at CPD thought it appropriate to suggest, in Johnson's CPD record, that he was involved in a gang. This was undoubtedly because that would have been untrue.

Moreover, Johnson has consistently testified that he was not involved in gangs. (Pl. SOF ¶ 13). He told his interrogators this during the early morning hours on May 11, 2012 when they interrogated him. (Pl. SOF ¶ 12). He testified to his effect at his criminal trial. (Pl. SOF ¶ 12). He testified to this effect at his deposition in this case. (Pl. SOF ¶ 12). Johnson's friend Brande Mitchel testified to this effect at his criminal trial. (Pl. SOF ¶ 14). These facts are uncontroverted. Moreover, Defendants have pointed to no witness in this case who has testified that Johnson was in a gang.

Defendants suggest that the Vice Lords gang essentially used a fleet of white Chevy Tahoes and the drivers of those Tahoes were all heavy Black males. (Doc. # 251 at p. 13). Johnson's Tahoe was made in 2009. (Def. SOF ¶ 49). Between 2010 and 2012, Chevrolet made 225,106 Tahoes. (Def. SOF ¶ 49). Moreover, white is the most common color for American vehicles. (Def. SOF ¶ 49). Therefore, Anthony Johnson's vehicle was hardly an unusual vehicle at the time.

Moreover, Defendants admit that gang members are often proud of their gang affiliations. (Pl. SOF ¶ 16). They brag about it, even to the police. (Pl. SOF ¶ 16). They frequently have tattoos reflecting their affiliation. (Pl. SOF ¶ 17). They frequently wear certain clothing to show their affiliation to others. (Pl. SOF ¶ 17). Yet Detective Schleder, one of the police detectives who investigated Anthony Johnson, testified that Johnson demonstrated none of these indicia of gang affiliation. (Pl. SOF ¶ 18).

**CPD Did This**

Defendants seem to attempt to place responsibility for Mr. Johnson's incarceration on the prosecutors. They seem to suggest that it was the State's Attorney's office, and not the police, that are responsible for what befell Johnson. However, Defendants' brief omits much of the record developed during the depositions that Defendants took of the various prosecutors who were involved here. That detailed record will be set out by Johnson below, in his argument rebutting any presumption drawn from the grand jury indictment.

**The Appellate Court Decision**

In one sentence in their brief, Defendants acknowledge that Johnson's convictions were overturned on appeal. (Doc. # 251 at p. 19). Nothing else is said there. But, the appellate opinion in this case does not just reverse the conviction. Effectively, the Appellate Court showed Plaintiff's innocence.

9

On May 19, 2021, The Appellate Court of Illinois, First Judicial District reversed Johnson's convictions. (*See* Ex. 89, *People v. Johnson*, 2021 IL App (1st 171885)). In reversing the convictions, the Appellate Court concluded that there was "no evidence that [Johnson] participated in Mason's plan to shoot the victims before or during the offense." (*Id.* at ¶ 103).

> Defendant has consistently maintained that he did not know Mason was armed or what Mason planned to do when defendant agreed to give him a ride. The evidence of defendant's actions before and during the offense are entirely consistent with that explanation, and the State presented no competent evidence contradicting defendant's account.

(*Id.* at ¶ 103).

First, the Appellate Court criticized the Prosecution's representation at trial that Johnson had a motive to assist Mason in the shooting: that Johnson (1) was either part of a gang or (2) did it for the money. (*Id.* at ¶ 65). "[T]here was no evidence of any motive [Johnson] had to participate in the gang-related shooting." (*Id.* at ¶ 75). "The undisputed evidence at trial showed that [Johnson] . . . was not a gang member, and had no criminal history." (*Id.* at ¶ 75). Moreover, the Prosecution's suggestion at trial that Anthony aided Mason in committing the crime in exchange for money was "simply preposterous" given that the only evidence presented at trial regarding Anthony being paid for giving Mason a ride was that Mason gave Anthony $10 when he got into the car. (*Id.* at ¶ 76).

The Appellate Court then dismantled the testimony of Alex Ware. In the present case, as in Johnson's criminal case, the other side relies extraordinarily on Ware's testimony. (*See e.g.,* Doc. # 251 at pp. 10-12, 19). The Appellate Court agreed with the Trial Court that Alex Ware's testimony was "critical to [Anthony Johnson's] convictions." (Ex. 89, *People v. Johnson*, 2021 IL App (1st 171885) at ¶ 78). The Appellate Court, however, starkly disagreed with the Trial Court regarding Alex Ware's testimony, and catalogued the many problems with Ware's testimony,

starting with the "repeatedly inconsistent accounts" Ware had provided on the multiple occasions when he described the incident. (*Id.* at ¶ 80).

> Ware called 911 twice, almost immediately after the Tahoe drove away from him, but never mentioned that the car stopped near him or that the driver, or anyone else, pointed a gun at him. Instead, Ware related that the Tahoe "shot right past" him. Ware also did not initially tell Detective Velasquez that the car had stopped next to him or that someone had pointed a gun at him. Detective Velasquez testified that Ware told her the truck fled east after the shooting, only mentioning that it slowed down as it approached Damen Avenue. Ware's inconsistent versions of events, and his omission of critical facts at a time when a person normally would have disclosed them, casts doubt on the believability of his testimony. . . .

> * * *

> Ware's account was also inconsistent regarding whether defendant rolled down the passenger side window down upon stopping the vehicle, the speed at which Tahoe drove away from the scene, whether he heard the gun click, and how long the vehicle was stopped in front of him. These multiple impeachments undermine the reliability of Ware's already dubious testimony.

(*Id.* at ¶¶ 80-81) (citations omitted). The Appellate Court found that Ware's testimony was cast into further doubt by the fact that it was contradicted by other evidence:

> Importantly, Ware's testimony that he only saw one person in the car as it approached 54th Street and Damen Avenue is contradicted by all the other undisputed evidence presented at defendant's trial. This testimony was so obviously inaccurate that it casts doubt on the rest of his testimony. Ware's testimony was also impeached by Virgil Johnson Jr., the only other witness to testify that he watched the vehicle as it fled from the scene of the shooting, who, unlike Ware, was accurate in his observation of two people in the vehicle. Virgil testified that he saw the passenger holding an automatic, silver pistol and that the vehicle did not make the stop Ware testified to, explaining that the car traveled at a "steady speed" of about 15 to 20 miles per hour and did not stop or slow down at all before it approached Damen Avenue to turn right. Virgil's account was consistent with the initial version of events Ware related in his 911 calls and to Detective Velasquez.

(*Id.* at ¶ 82). The Appellate Court concluded that:

> Given the undisputed inaccuracy on a central aspect of Ware's account, his changing renditions, and the extensive impeachment of his testimony, we conclude that Ware's testimony was too unreliable to support defendant's convictions.

(*Id.* at ¶ 83). The Appellate Court also pointed out that "there is no indication that the State took Ware's account seriously enough to charge defendant with an offense related to his alleged attempt to shoot Ware." (*Id.* at ¶ 84).

Having addressed Ware's testimony, the Appellate Court then found that there was "no evidence of defendant's conduct before or during the offense that would indicate a prior intent or advance planning to assist Mason in shooting the victims or participation in any common criminal design." (*Id.* at ¶ 90).

> Although the State claims that defendant did not report the shooting to the police, we note that defendant was arrested within approximately two hours, leaving little time to act, and the short delay was explained by defendant as he was seeking legal advice during that time and was scared for his and his family's safety. Moreover, once the police arrived, defendant generally cooperated, voluntarily signing a consent to the search of his phone. Such conduct by defendant shows a lack of a guilty mind and cuts in defendant's favor.

(*Id.* at ¶ 89).

The Appellate Court also demonstrated the impropriety of any reliance on call logs of Anthony Johnson's cell phone on the day of the shooting. Nevertheless, Defendants here continue to make much of those alleged calls. (Doc. # 251 at p. 15). Specifically, the Appellate Court criticized the Prosecution's representation at trial that there were 16 calls between Anthony Johnson and the phone number supposedly belonging to Tywan Mason, and that these 16 calls were evidence of their prior planning. The Appellate Court pointed out that a closer inspection of the phone company call logs revealed that there were eight calls exchanged between the two phone numbers, and every call was well under a minute long. "This evidence is very different from the 'numerous' calls from which the State asked the trial court to infer that Mason and defendant were plotting a double murder." (Ex. 89, *People v. Johnson*, 2021 IL App (1st 171885) at ¶ 95). The

Appellate Court went on to conclude that a proper review of the phone company call log actually pointed toward Anthony Johnson's innocence, not his guilt.

> In fact, the call log does not establish whether defendant and Mason spoke at all or whether the phone rang for 12 to 48 seconds without an answer. Given the very short duration of all the phone calls, we cannot conclude that they support an inference that defendant and Mason were planning a drive-by shooting. Instead, the calls are more consistent with the defense theory that Mason was attempting to reach defendant to secure a ride for his own purposes.

(*Id.* at ¶ 98).

The Appellate Court also disagreed with the Prosecution's characterization of Johnson's actions in angling the vehicle and reclining in his chair, which the Prosecution contended were to give Tywan Mason a clear shot at the victims.

> Defendant's act of moving his body away is entirely consistent with his stated surprise and fear at his passenger shooting a firearm in front of his face and does not establish his prior knowledge of Mason's criminal intent or the intent to promote or facilitate the offense's commission. Additionally, had defendant been aware of Mason's plans, defendant likely would have driven in the opposite direction, so that Mason would have had a "clear shot" through the passenger window rather than over defendant seated in the driver's seat.

(*Id.* at ¶ 102).

To summarize, the Appellate Court found that the Prosecution had failed to present any evidence of Johnson's supposed motive in assisting Mason: Johnson was not in a gang, and the idea that he would assist Tywan Mason in committing murders in exchange for $10 was "preposterous." Instead, the Prosecution invited the Trial Court to infer Johnson's guilt based on the "dubious" testimony of Alex Ware, which was contradicted by other evidence and, in fact, by Ware himself, and by mischaracterizing the phone company call logs to imply more contact between Johnson and Mason than what a more diligent review of the logs ultimately revealed.

**ARGUMENT**

**SUMMARY JUDGMENT STANDARD**

In resolving a summary judgment motion, the Court views the evidence in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018); *Amos v. City of Chicago*, No. 22 C 1564, 2024 WL 640860, at *1 (N.D. Ill. Feb. 15, 2024). Moreover, the Court should consider the entire evidentiary record and should view all of the evidence, drawing all reasonable inferences in favor of the non-movant. *Horton*, 883 F.3d at 948; *Amos*, 2024 WL 640860 at *3. The Court should not weigh conflicting evidence, resolve credibility or assess which party's version of the facts is most likely to be true. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021); *Amos*, 2024 WL 640860 at *3.

**I. FALSE ARREST CLAIM**

Johnson will dismiss his false arrest claim.

**II. DEFENDANTS' SUMMARY JUDGMENT MOTION ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM SHOULD BE DENIED**

**A. There Is A Fact Issue Regarding Probable Cause**

Defendants seek summary judgment on the grounds that there was probable cause to prosecute Johnson. Probable cause is an objective rule. An officer's subjective belief about it is not determinative. *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023); *People v. Lee*, 214 Ill.2d 476, 828 N.E.2d 237, 244 (2005). The police cannot rely on fabricated evidence or evidence knowingly tricked out of a witness to support probable cause. *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011); *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012). Moreover, Johnson was prosecuted on an accountability theory. Such a prosecution must show that he shared Mason's criminal intent, or that there was a common criminal design. *People v. Perez*, 189 Ill.2d

14

254, 725 N.E.2d 1258, 1264–65 (Ill. 2000); *People v. Taylor*, 186 Ill.2d 439, 712 N.E.2d 326, 329 (Ill. 1999); *People v. Dennis,* 181 Ill.2d 87, 692 N.E.2d 325, 334 (Ill. 1998); *People v. Fernandez*, 2014 IL 115527, 6 N.E.3d 145 (Ill. 2014). Additionally, mere presence at the scene of the crime is insufficient. *Perez*, 189 Ill.2d at 254, 725 N.E.2d at 1265; *Taylor*, 186 Ill.2d at 439, 712 N.E.2d at 329; *Dennis*, 181 Ill.2d at 87, 692 N.E.2d at 334. The probable cause issue is usually a question of fact for the jury. *Amos*, 2024 WL 640860 at *5.

Because there are contested issues of fact, Defendants should not prevail on this issue. *See Amos*, 2024 WL 640860 at *6. In *Amos*, plaintiff Amos brought federal and state claims for malicious prosecution. *Id*. He was a guest at a residence. The defendant CPD Officers were working as a tactical team in the area. A gunshot was detected nearby by ShotSpotter. The defendants were dispatched to respond. Amos was on the porch when the Officers arrived. *Id*. at *1. The relevant facts about what happened next were "hotly disputed." The Defendants asserted that as they approached, Amos stood, adjusted an object in his waistband and fled into the house. They believed the object to be a gun. *Id*. at *2. In the house, Amos was taken down and a gun was found in the cushions of a couch near where Amos had placed his hand. Amos denied that he had a gun or that he placed it in the couch's cushions. He admitted that he was a convicted felon. Amos was charged with unlawful use of a weapon by a felon. The case was then presented to a grand jury. Amos was indicted on two counts of being an armed habitual criminal and three counts of unlawful use of a weapon by a felon. *Id*. at *3.

*Amos* holds that the focus of the analysis of probable cause in a federal malicious prosecution claim is on whether there was probable cause at the time of charging, not the time of arrest. *Id*. at *6. The *Amos* court determined that it could not grant summary judgment to the Defendant Officers because of fact issues regarding probable cause. To do so would require

accepting the Officers' version of events and disregarding Plaintiff's version. Defendants claimed Amos had a gun; Amos claimed he did not. This and other fact issues barred summary judgment that there was probable cause to prosecute Amos. For the same reasons, summary judgment for the Officers was denied respecting Amos' Illinois law malicious prosecution claim. *Id.* at *6.

Here, fact issues similarly bar summary judgment. Before charging Johnson, CPD learned about the evidence that Johnson did not work with Mason to murder the victims. Specifically, they knew about Johnson's car service. They knew that he was not in the CPD gang database. He presented no evidence of gang affiliation. He did not wear gang colors. He had no gang tattoos. Johnson did not brag about gang membership in the way that Defendants assert actual gang members brag. Indeed, Johnson has always and consistently denied any gang affiliation at all.

CPD also knew that Johnson was heavy and said that he generally drove with his seat pulled back. They knew that Johnson said that the vehicle driver's side window was open before Mason pulled his gun and committed murder. They knew, or could have easily learned, that the day was warm enough to drive with the windows down.

CPD knew that Johnson said that after the shooting he was frightened. He was frightened for himself and for his family. Johnson drove Mason from the scene while Mason continued to hold the gun he had used to murder his victims, not because Johnson was a part of the crime. Johnson told CPD that after Mason got out of his car, Johnson was frightened that Mason might come to Johnson's home and harm his family or himself.

The CPD Officers knew that they had interrogated Johnson in the middle of the night when he was frightened and sleep deprived. They knew that they had no physical evidence that Johnson was directly involved in the shooting. Gun powder residue tests were negative.

Then, as now, the Defendants have relied heavily on Ware. The Appellate Court determined conclusively that Ware was so incredible that his testimony was of no moment. The reasons articulated by the Appellate Court for this conclusion were well known to the CPD Officers as of the time when Johnson was charged. CPD knew Ware's stories were inconsistent. They knew Ware's story was contrary to known, established facts. In particular, they knew that the only other eyewitness to the vehicle's travel east on 54th Street after the shooting said that the vehicle did not slow and stop in front of Ware as Ware had said.

At bottom, the Appellate Court's opinion should be determinative of the facts that defeat summary judgment on the probable cause issue. In any event, at the very least, here as in Amos there are fact issues that should bar summary judgment on the probable cause issue.

### B. Any Presumption of Probable Cause Based on Johnson's Indictment Is Rebutted

Defendants argue that there is a rebuttable presumption of probable cause because a grand jury indicted Johnson. (Doc. # 251 at 32-33). However, any presumption here is rebutted because exculpatory evidence that should have been presented to the grand jury was not in fact presented. *See, e.g.*, *Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2019); *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018). *Rainsberger* is important because it involves the omission of information from a probable cause affidavit. *Rainsberger*, 913 F.3d at 647. *Rainsberger* holds that the probable cause issue could not be resolved as a matter of law.

In *Rainsberger*, a probable cause affidavit had been filed against Rainsberger for his arrest for the murder of his mother. This procedure was analogous to the grand jury proceeding here and the *Rainsberger* Defendants relied on it to establish probable cause. *Rainsberger*, 913 F.3d at 643. Rainsberger was held for two months after being charged. *Id.* at 642. Charges were later dropped and Rainsberger brought a § 1983 suit alleging that the probable cause affidavit used to charge

him was not accurate, in part because it omitted relevant, exculpatory facts. Although *Rainsberger* is a qualified immunity case, it applies the same analysis as is asserted to be applicable by Defendants for their rebuttable presumption argument. (*See* Doc. 251 at 32). *Rainsberger* relies on the role of conflicting facts regarding probable cause in denying summary judgment. *Rainsberger*, 913 F.3d at 648.



These omissions, among others, make *Rainsberger* applicable and should form a basis to rebut the presumption pressed by Defendants. Here, as in *Rainsberger*, there should be no summary judgment for the Defendants.

**C**      **There Is a Fact Issue Regarding Proximate Cause**

Citing *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) and *Sykes v. Anderson*, 625 F.3d 294, 308 & n. 5 (6th Cir. 2010), Defendants assert that Officers Garcia, Schleder and the CPD need to have made, influenced or participated in the decision to prosecute Johnson. But, their influence and participation is demonstrated by the ASA's own testimony. (Doc. 251 at 26-27).

Defendants essentially assert that they did not play a role in the decision to prosecute Johnson. Rather, they seem to suggest that all responsibility was the prosecutors'. (Doc. 251 at 34-

Furthermore, testimony regarding the role of the Police either shows their substantial role in Johnson's prosecution or was not obtainable because of the work product objections made by the ASA witnesses. (*See* Pl. SOF ¶ 20). For example, ASA Schwarz was asked about the influence of the police on the prosecution, but that testimony was not supplied because of work product objections and directions to the witness not to answer. (Pl. SOF ¶ 21). Furthermore, Schwarz generally considered police reports and police file materials in making his decisions. (Pl. SOF ¶ 22). These documents included recorded interviews conducted by the police. Indeed, ASA Goldish testified that she determines someone to not be credible anytime what they say conflicts with what a police report says. (Pl. SOF ¶ 23). ASA Essig testified that he generally relies on the information the police gather. (Pl. SOF ¶ 24). ASA Greenstein testified that the information she gets about gang affiliations comes from the CPD. (Pl. SOF ¶ 25). Moreover, Defendants do not assert or establish that any of the involved ASAs interviewed Johnson. Rather, they relied on the CPD's interrogations of him. (Pl. SOF ¶ 26).

Accordingly, the Officers' hand in Johnson's prosecution is uncontrovertibly established such that they proximately caused his prosecution. At the least, there is a fact issue on this issue.

> ### D. There Is a Fact Issue Regarding Malice

Defendants assert that Johnson cannot show malice on their part. (Doc. # 251 at 37-38). However, they concede that malice can be inferred where probable cause is lacking. (*Id.*). *See also Gauger v. Hendle*, 2011 IL App (2d) 100316, 954 N.E.2d 307 (Ill. App. Ct. 2011). For the reasons

established above, probable cause was lacking here. Accordingly, the inference of malice should apply.

### E. Qualified Immunity Does Not Bar Johnson's Claim

Defendants assert that the federal malicious prosecution claim is shielded by qualified immunity. (Doc. 251 at 38-39). Defendants concede that this immunity only applies if the Defendants' conduct did not violate clearly established statutory or constitutional rights that a reasonable person would have known about. Defendants frame two questions: first, was there a violation of a constitutional right of Johnson's; and second, was that constitutional right clearly established at the time of the alleged violation. (Doc. 251 at 38). Johnson's malicious prosecution claim raises Johnson's constitutional right not to be subject to such prosecution. There seems to be no disagreement about his constitutional right not to be maliciously prosecuted.

Additionally, Defendants say that the existence of a clearly established constitutional right is satisfied if there was a reasonably analogous case that articulated the right at issue and a similar set of facts. (Doc. 251 at 39). Johnson already cited and extensively discussed *Amos*, 2024 WL 640860 at *6. *Amos* was earlier discussed at length. It holds that there were conflicting facts regarding probable cause that barred summary judgment. *Amos* in turn relies on well-established cases predating the date of Johnson's prosecution. *See id.* at *3–*6. Additionally, Johnson above discusses *Rainsberger* at length. *Rainsberger* relies on well-established cases predating Johnson's prosecution. *See Rainsberger*, 913 F.3d at 643, 647–654.

Moreover, *Rainsberger* addresses a qualified immunity claim. In that context, it specifically discusses the issue whether it would have been clear to a reasonable official that their conduct was unlawful in the situation. *Rainsberger*, 913 F.3d at 652. Quoting *Whitlock v. Brown*, 696 F.3d 406 (7th Cir. 2010), *Rainsberger* holds that "it violates clearly established law to

'intentionally or recklessly withhold material information from a warrant application'" Thus, "a competent officer would – indeed must – consider whether the Fourth Amendment obligates him to disclose particular evidence." *Rainsberger*, 913 F.3d at 654.

Here, Johnson catalogues the substantial quantity of exculpating evidence that was not presented to the grand jury. Thus here, as in *Rainsberger*, there should be no qualified immunity. At best for Defendants, there is a fact issue about qualified immunity that bars summary judgment for Defendants.

### F. The Illinois Tort Immunity Act Does Not Apply

Defendants assert that the Illinois Tort Immunity Act shields them from the malicious prosecution claim. They say the Act applies because they did not act willfully and wantonly. (Doc. 251 at 40). This argument has effectively been addressed earlier. Johnson has shown that malice should be inferred here. He has shown that the Defendants ignored and omitted nearly all evidence that exculpated him. Under these circumstances, the Act should not apply.

### G. Officer Perez

Johnson will dismiss his claims against Officer Perez.

## III. SUMMARY JUDGMENT SHOULD BE DENIED REGARDING THE EQUAL PROTECTION CLAIM

Defendants say that there is no hint in this case of anything involving race. (*See* Doc. 251 at 41-45). At best for them, this is a fact issue. From the very beginning, this case has been about race. Defendants' brief here begins with that narrative. (Doc. # 251 at 9). The words gang or gangster appear 34 times throughout Defendants' brief. Defendants' Statement of Facts mentions the words gang or gangster 44 times. The gangs involved in this case, the Vice Lords and the Gangster Disciples, are African American gangs.

Defendants faced a challenge in getting a conviction of Anthony Johnson. He told them that he was just an innocent driver, offering a car for hire service. Others confirmed that fact. The CPD's records generally reflect gang affiliations in cases where the CPD believes that it is appropriate to do so. This practice can be seen here in the CPD records for both the victims and the murderer, Mason. CPD's records never reflected that Johnson was involved with gangs. But, Johnson is Black and was only 26 at the time. A young Black man found himself amidst a gang skirmish where perpetrators and victims shared the same race. Johnson said he was not in a gang. And, if he was not, the case against him simply did not hold water. Why would he drive Mason to this location? The *only* answer Defendants ever supplied was that Johnson must be in a gang. A Black gang called the Vice Lords. Defendants were so locked in on this narrative that they began to describe the Vice Lords as the Vice Lords gang from 54th or 55th and Damen. (Def. SOF ¶¶ 23–24, 49). They do not hesitate in this context to mention that Johnson resided on Damen, just south of 55th. (Def. SOF ¶ 25). But they omit Johnson had lived there his entire life. At bottom, the only way to tie Johnson into Mason's planning and actions was to paint him as a member of the same African American gang based solely on the neighborhood into which he was born and raised.

Evidence of Defendants' malice, and the racial element here, is seen in the comment by Detective Garcia about the film *Driving Miss Daisy*. The film features two lead characters, one Black. Additionally, another Police Officer pointedly told Johnson that he would not like prison, referring to Johnson as "boy." Defendants say that there is no evidence that Johnson was arrested and detained because of his race. But the evidence is overwhelming that he was arrested and detained because, despite all the evidence, he was depicted as being in a Black gang.

22

Johnson's evidence that he was not in a gang, most of it uncontroverted, establishes a discriminatory effect and a discriminatory purpose. *See Chavez v. Ill, State Police*, 251 F.3d 612 (7th Cir. 2001). It demonstrates that the decision makers here took action against him "at least in part" because of his race. *Chavez*, 251 F.3d at 645.

Moreover, Defendants assert that they had probable cause. (Doc. 251 at 42). But, that asserted probable cause is based on the fact that Johnson gave Mason a ride for hire and took Mason where Mason asked him to go. That was Johnson's typical car service. It is based on Johnson's stopping the car where Mason told him to stop. It is based on Mason's murderous actions which Johnson swears he did not expect or know about until Mason fired. It is based on Mason's having leaned across Johnson to fire the shots, something Johnson did not expect much less plan. No evidence contradicts Johnson's testimony that he was completely surprised by the gunfire. No evidence contradicts Johnson's testimony that the only reason he moved back was because he was shocked and frightened by the gunfire. Plus, he generally drove with his seat pushed back in any event.

The probable cause narrative continues with Defendants' continued reliance on Ware and his wholly discredited testimony. But, the black gun the Police found in Johnson's room was a broken down revolver with a cracked barrel. Ware's story did not describe Johnson's operable gun, the one for which he had a FOID card. That gun was a silver automatic handgun. Defendants allude to physical evidence, but their own tests on that evidence failed to tie Johnson into the planning or execution of these crimes. And, to top off the probable cause narrative, Defendants return to their core, race-based narrative: this shooting was part of a gang conflict between the Vice Lords and the Ganster Disciples. (Doc. 251 at 42-43).

At bottom, the gang narrative pressed by Defendants is fundamentally about race. They seem to argue that despite the fact that they have no evidence that Johnson was in the Vice Lords, he must have been because they are a black gang and Johnson is a black man. And Defendants press that theory up to this very moment. Accordingly, Johnson's equal protection claim should go to trial.

## IV.     THE HATE CRIME CLAIM

Johnson will dismiss his Hate Crime claim.

## V.      SUMMARY JUDGMENT SHOULD BE DENIED REGARDING THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Defendants argue that they should get summary judgment regarding Johnson's intentional infliction of emotional distress claim. (Doc. 251 at 46-47). To make this argument, Defendants essentially recycle old arguments. Citing *McDade v. Stacker*, 106 Fed.Appx. 471, 476 (7th Cir. 2004), *Larsen v Elk Grove Village*, 433 Fed.Appx. 470, 474 (7th Cir. 2011) and *Alexander v. City of Danville, Illinois*, No. 18-2290, 2022 WL 1321291, at *12 (C.D. Ill. May 3, 2022), they reassert their probable cause argument. (Doc. 251 at 47). However, that argument should be rejected here for the reasons Johnson stated in earlier dealing with the argument. Defendants also reprise their argument based on the Illinois Tort Immunity Act, saying it applies here as well. (Doc. 251 at 47). However, the reasons earlier stated by Johnson why the Act does not apply are just as valid and forceful here as above.

Defendants state that their behavior was not "extreme and outrageous." (Doc. 251 at 47). However, Johnson has established that they omitted relevant and material facts at key times in the process, particularly before the grand jury. This resulted in Johnson's wrongful conviction and cost him nine years of his life. Defendants' omissions, and their resulting effect on Johnson are surely "extreme and outrageous."

24

## VI.   THE UNKNOWN DETECTIVE/OFFICER JANE DOE AND UNKNOWN DETECTIVE/OFFICER JOHN DOE DEFENDANATS

Johnson will dismiss his claims regarding unknown detective/officer Jane Doe and unknown detective/officer John Doe.

## VII.   SUMMARY JUDGMENT SHOULD BE DENIED REGARDING THE *RESPONDEAT SUPERIOR* AND INDEMNITY CLAIMS

Defendants assert that the City of Chicago is entitled to judgment as a matter of law on Johnson's *respondeat superior* and Indemnification claims. Specifically, Defendants argue that the City is immune from prosecution pursuant to § 2-109 of the Tort Immunity Act, 745 ILCS § 10/2-109. However, Defendants' argument rests on the presumption that the Individual Defendants are not liable for the claims alleged against them. The Tort Immunity Act does not render a local public entity such as the City of Chicago immune where the employees are liable. *See, e.g.*, *Torres v. City of Chicago*, 123 F. Supp. 2d 1130, 1133 (N.D. Ill. 2000) (finding the City of Chicago was not entitled to immunity for police officers' failure to promptly summon aid, and noting that under the Tort Immunity Act, "the City may be liable on a theory of *respondeat superior* if its employees are found to be liable").

For the reasons provided earlier in this memorandum, there exists a genuine issue of material fact regarding the Individual Defendants' liability for the alleged claims. Therefore, the City is not entitled to judgment as a matter of law on Count VIII or Count IX.

### CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment should be denied in its entirety, except as to the claims and defendant Johnson will be dismissing.

Dated:  August 26, 2024                  Respectfully submitted,

/s/  *Daniel G. Litchfield*
    Daniel G. Litchfield (6185695)
    Laurence J.W. Tooth (6314153)
    Dora C. Lee (6332960)
    LITCHFIELD CAVO LLP
    303 W. Madison St., Ste. 300
    Chicago, IL 60601
    (312) 781-6677
    Litchfield@LitchfieldCavo.com
    Tooth@LitchfieldCavo.com
    Leed@LitchfieldCavo.com

    ***Counsel for Plaintiff***

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on August 26, 2024.

By:    <u>*/s/ Daniel G. Litchfield*            </u>