UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>OFFICER PEREZ, #10546, et al.,<br><br>Defendant. | Case No. 12-cv-9225<br><br>Judge Martha M. Pacold |

### MEMORANDUM OPINION AND ORDER

Before the court are plaintiff Anthony Johnson's motion to withdraw certain claims, [285], and defendants Joseph Perez, Eugene Schleder, Roberto Garcia, and the City of Chicago's motion for summary judgment, [248].[1] For the reasons below, plaintiff's motion to withdraw claims, [285], is denied, and defendants' motion for summary judgment, [248], is granted.

### BACKGROUND

The following facts are undisputed unless otherwise noted. On May 10, 2012, at approximately 4:45 p.m., Tywan Mason shot and killed Lamont Matticx and William Junius in a drive-by shooting. [252] ¶¶ 6–8.

Plaintiff Anthony Johnson drove Mason to the house where Matticx and Junius were staying that day. *Id.* ¶¶ 8–10. Though Johnson admitted that he drove Mason to the scene of the shooting, Johnson consistently claimed that he had no idea that Mason was armed or that Mason was going to shoot anyone. *Id.* ¶ 9; [252-41] at 108:6–21. Johnson told police that he picked up and drove Mason as part of his side job as a cab driver. [252] ¶¶ 60–70.

Based on his suspected participation in the shooting, Johnson was indicted for murder on an accountability theory in 2012 and again in 2013. *Id.* ¶¶ 123, 151. Johnson was convicted in 2016 and sentenced to life in prison. *Id.* ¶¶ 123, 151. In 2021, the Illinois Appellate Court reversed Johnson's conviction, finding that the State had failed to prove guilt beyond a reasonable doubt. *Id.* ¶ 153.

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

Johnson now sues the officers involved in his arrest and conviction under Section 1983 and various state-law causes of action.

I. **Officers Investigate the Murders**

On May 10, 2012, defendants Garcia and Schleder, along with several other officers who are not defendants in this case, were dispatched to a house on Hoyne Avenue in Chicago, Illinois, to investigate a shooting. *Id.* ¶ 14. The officers spoke to several witnesses who gave their accounts of what they saw.

Virgil Johnson, a neighbor of the victims, reported that he was cutting his grass when he heard multiple gunshots. *Id.* ¶ 15. He then saw a white SUV traveling eastbound on 54th Street with two black males seated inside. *Id.* One of these individuals appeared to be holding a silver handgun and "tampering" with the magazine. *Id.* Shuvonta Howard Denton, another bystander, reported that he saw a white Chevrolet Tahoe drive down 54th Street before making a partial left turn onto Hoyne Avenue. *Id.* ¶ 49; [252-5] at 24–26; [252-59] at 4. The Tahoe stopped, several shots rang out, and the Tahoe turned back onto 54th Street and continued driving. *Id.*

Another witness, Stanley Watson, reported that he spoke to Matticx immediately after Matticx was shot. [252] ¶ 45; [252-5] at 21. Watson recounted that before Matticx became unresponsive, he told Watson, "Bo shot me! Tell them Bo shot me!" *Id.* "Bo" was a nickname people used to refer to Tywan Mason, the shooter. [252] ¶¶ 23, 70. Authorities later determined that Matticx was a member of the Gangster Disciples, while "Bo," i.e., Mason, was a member of the Vice Lords, a rival gang. [254] ¶¶ 23, 107–08, 134; [252-76] at 3. Police believed that the shooting stemmed from this gang rivalry. [252] ¶¶ 6, 117, 134.

Alex Ware, another bystander, reported that he had seen a white Tahoe driving eastbound toward Damen Avenue away from the scene of the shooting. *Id.* ¶ 19. Ware reported that he could see smoke coming out of the driver's side window as the vehicle came toward him. *Id.* ¶ 20. Ware told authorities that the Tahoe pulled up beside him. The driver rolled down the window, pointed a black handgun at Ware for a few seconds, and then drove off. *Id.* ¶¶ 20–21, 41; [252-53] at 3.

Ware later recounted that he saw the driver's face for three to five seconds. *Id.* ¶ 41. He described the driver, who pointed the gun at him, as a black male in his late twenties with a medium brown complexion, chubby face, and a small beard. *Id.* ¶ 21; [252-53] at 3. Both parties admit that Johnson fit the physical description given by Ware. [252] ¶ 21; [272] ¶ 21. Ware later positively identified Johnson's white Tahoe as the vehicle he had witnessed fleeing the scene. [252] ¶ 27.

However, Ware's account appears to conflict with earlier statements Ware gave to police. Ware had called 911 several times immediately after he saw Johnson's Tahoe drive by on May 10. [252] ¶ 12; [256]. But in the several calls he made to police,

Ware only reported that the shots had been fired from a white Suburban, Yukon, or Tahoe and what he thought was the license plate number. [252] ¶ 12. Ware did not report that the driver had pulled up alongside him, nor did he report that the driver had pointed a weapon at him. *Id.*; [256]. Additionally, Virgil Johnson testified, both in statements to police and at plaintiff Anthony Johnson's trial, that he saw the truck driving down 54th Street near Damen Avenue. [283] ¶ 15; [252-4] at 14; [252-79] at 82:1–16. Virgil Johnson never testified, however, that he saw the truck stop, nor did he recount seeing the driver point a weapon at someone. [252-4] at 14; [252-79] at 73:1–22.

After interviewing witnesses at the scene on May 10, police determined that Anthony Johnson was the owner of the Tahoe identified at the scene of the crime. [252] ¶ 26. Police located the Tahoe outside Johnson's home on Damen Avenue. *Id.*

After driving Mason to the scene of the crime, Johnson had driven eastbound on 54th and then southbound on Damen Avenue. *Id.* ¶ 10. At some point, Mason exited the vehicle. *Id.* Johnson drove to his home on Damen Avenue. *Id.* After parking the vehicle in his backyard, Johnson searched the vehicle for shell casings. *Id.* Johnson did not call 911 or otherwise attempt to contact law enforcement. *Id.* ¶¶ 10, 32; [252-86] ¶¶ 11–12.

After discovering the Tahoe parked outside Johnson's home, Officers Perez and Ortoneda placed Johnson's home under surveillance. [252] ¶¶ 26–29. At approximately 6:50 p.m., Johnson exited his residence and was taken into custody. *Id.* ¶ 30. Detectives Garcia and Schleder obtained consent to search Johnson's home from Johnson's grandmother. *Id.* ¶¶ 32–33. While searching Johnson's bedroom, police found a black revolver with a cracked barrel. *Id.* ¶ 34.

## II. Police Interview Anthony Johnson

At approximately 7:14 p.m. on May 10, police interrogated Johnson at the Chicago Police Department's Area Central Headquarters. *Id.* ¶ 56. The interview was recorded. *Id.* (recordings of Johnson's interviews with police are available at [256], Exhibits 36, 37, 38, 39, and 40). After police read Johnson his *Miranda* rights, Johnson began by telling police that he was a mechanic. *Id.* ¶ 57. He did not mention that he worked as a cab driver on the side. *Id.* Police continued to question Johnson late into the evening on May 10. *Id.* ¶¶ 36–40. At approximately 10:06 p.m., Johnson was taken out of the interview room to participate in a lineup, where Alex Ware identified Johnson as the person Ware saw driving the Tahoe and who pointed the black handgun at him. *Id.* ¶¶ 36–37.

In the early morning hours of May 11, 2012, Detectives Garcia and Schleder interviewed Johnson for approximately two hours. *Id.* ¶ 58. Garcia and Schleder re-read Johnson his *Miranda* rights. *Id.* ¶ 59. During this interview, Johnson admitted that he had not told the "whole truth" about his occupation in his prior interview. *Id.*

3

¶ 60; [252-41] at 21:4–5. Johnson explained that he regularly did "cab work" and "taxi rides for people" on the side. *Id.* On the day of the shooting, Johnson had received a call to pick someone up for a ride. [252] ¶ 64; [252-41] at 21:9–11.

Johnson initially said he was "not too sure" who he drove that day. [252] ¶ 61; [252-41] at 21:11–13. The officers asked if Johnson knew the shooter. [252-41] at 23:9. Johnson answered, "I don't know him. I don't even know him." *Id.* at 23:13. The officers asked Johnson whether he saw the passenger shoot his gun while they were driving. [252] ¶ 63; [252-41] at 25:7–10. Johnson answered "No." [252] ¶ 63; [252-41] at 25:10. The officers informed Johnson that his truck had been identified at the scene of the crime. [252] ¶ 64; [252-41] at 25:11–18. They asked whether Johnson had ever picked up the passenger before. [252] ¶ 64; [252-41] at 26:1–2. Johnson shook his head. [252] ¶ 64.

A few minutes later, Johnson admitted that he had seen the passenger fire his gun from the Tahoe and that he knew the passenger's name. *Id.* ¶ 65; [252-41] at 27:10–13. Johnson recounted that the passenger leaned across Johnson's seat and began firing out the driver's side window. [252] ¶¶ 65, 67; [252-41] at 40:12–17. When the shooting began, Johnson leaned back in his seat. [252] ¶¶ 67, 73; [252-41] at 46:1–18. When asked why he leaned back, Johnson told police it was because his seat automatically leaned back due to a missing bolt. [252] ¶ 74; [252-41] at 65:19–66:5. In his response to defendants' requests for admissions, Johnson states that he "always drove with the seat set back." [252-86] ¶ 8. Johnson denies that he leaned back to give his passenger a better shot. [272] ¶ 74.

Officers continued to press Johnson about the name of the person he drove to the scene. [252] ¶ 69; [252-41] at 54:6–12. Johnson told officers that the shooter was named "Bill" or something similar. [252] ¶ 69; [252-41] at 54:6. Eventually, Johnson admitted that he knew the shooter as someone named "Bo."[2] [252-41] at 57:16. Johnson admitted that he had known "Bo" for a few months. [252] ¶ 70; [252-41] at 58:16–18.

Johnson recounted that on the day of the shooting, he received a call from someone named "Jamel," who asked him to pick up "Bo." [252] ¶ 71; [252-41] at 63:9–11. Johnson explained that he did not know when he received the phone call from "Jamel" because he "had erased the call logs" on his phone. [252] ¶ 77; [252-41] at 96:5–12. When officers asked why Mason did not call Johnson directly to request a ride, Johnson claimed it was because Mason did not have a phone. [252] ¶ 77; [252-41] at 97:9–12. Johnson denied knowing that Mason had a gun or that Mason intended to shoot anyone. [252] ¶ 80; [252-41] at 108:16–21.

---

[2] As noted above, "Bo" was a nickname people used to refer to Tywan Mason, the shooter. [252] ¶¶ 23, 70.

4

Later that night, Johnson's story changed. After Johnson consented to a search of his cell phone, Detectives Garcia and Schleder interviewed Johnson again. [252] ¶¶ 81–83. In this follow-up interview, Johnson admitted that nobody had actually called him to pick up Mason. [252] ¶ 83; [252-41] at 118:1–2. Rather, Mason had approached Johnson while Johnson was cleaning out his truck outside a liquor store. [252] ¶ 84; [252-41] at 119:1–9. Johnson now concedes that he told at least one lie during his interview with Detectives Garcia and Schleder. [252] ¶ 88; [252-86] ¶¶ 36, 37, 141. Johnson contends that he lied because "Mason was still at large and [Johnson] was frightened for his family and himself." [252-86] ¶ 36.

A search of Johnson's phone revealed a photo of Mason associated with a contact entry labelled "Booq." [252] ¶ 91. This contact was listed under "Frequently Contacted" individuals. *Id.* Detectives also found a picture of a black colored revolver on Johnson's phone. *Id.* ¶ 92; [252-5] at 20.

Investigating detectives made a request to Johnson's cell phone provider for call records from the day of the incident. *Id.* ¶ 94. These records revealed that the phone number associated with Mason's contact entry appeared sixteen times in Johnson's call records on the day of the shooting. *Id.* The parties dispute whether these records reflect sixteen actual calls between Mason and Johnson on the day of the shooting. [272] ¶¶ 94, 137. Johnson points out that several of the "calls" lasted less than twenty seconds. *Id.* ¶ 137; [254-6] at 2. According to Johnson, this suggests that many of the identified calls could have been nothing more than a phone ringing, unanswered. [272] ¶ 137. Johnson contends that only eight of the sixteen entries in the call records reflect actual communications between Johnson's phone number and Mason's number, and each of these communications was less than a minute long. *Id.*; [254-6] at 2.

On May 12, 2012, after speaking with several witnesses and reviewing the facts of the case, an Assistant State's Attorney ("ASA") approved first-degree murder charges against Johnson based on his assessment that Johnson was accountable for the shootings of Matticx and Junius. [252] ¶ 95; [252-5] at 25; [252-25] at 50:10–21. On May 14, Detective Garcia signed criminal complaints charging Johnson with the murders of Matticx and Junius. [252] ¶ 100; [252-65].

### III. Johnson's Indictment and Conviction

In June 2012, a grand jury indicted Johnson on twelve counts of first-degree murder, two counts of attempted murder, and two counts of aggravated discharge of a firearm. [252] ¶ 113; [252-74].

███████ testified at the grand jury proceedings. ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

5



also testified before the grand jury.

Several other eyewitnesses also testified

At the time of Johnson's first indictment, Tywan Mason, the shooter, had not been located. [252] ¶ 113. It was not until March 2013, nearly a year after the shooting, that police apprehended Mason. *Id.* ¶ 114; [252-6] at 12. Mason declined to speak with investigators and invoked his right to counsel. [252] ¶ 114; [252-6] at 12–13. On April 30, 2013, a grand jury indicted both Mason and Johnson for first-degree murder.[252] ¶¶ 114–22; [252-75]. This was Johnson's second indictment.

Johnson's trial commenced on August 29, 2016. [252] ¶ 135. Johnson waived his jury trial rights and was tried before a state court trial judge. [252] ¶¶ 123–35. At trial, the State called Detective Schleder as a rebuttal witness, but his testimony was limited to laying the foundation for the video recording of Johnson's interview with police. *Id.* ¶ 148; [252-81] at 7:12–16:8. Perez and Garcia did not testify at Johnson's trial. [252] ¶ 150.

After a five-day trial, the court found Johnson guilty of first-degree murder on an accountability theory. *Id.* ¶ 151; [252-82] at 15:1–7. The court sentenced Johnson to life in prison. [252] ¶ 151.

IV.   **Reversal**

Johnson appealed his conviction. On appeal, Johnson argued that the State failed to prove beyond a reasonable doubt that Johnson shared Mason's criminal intent or common criminal design. [252] ¶ 153; [252-88]. He also argued that his life sentence was unconstitutional. *Id.*

In 2021, the Illinois Appellate Court reversed Johnson's conviction, holding that the State failed to prove Johnson's guilt beyond a reasonable doubt. [252] ¶ 153; *People v. Johnson*, 196 N.E.3d 1014, 1026 (Ill. App. Ct. 2021).

6

## V. Federal Court Proceedings

Johnson filed a pro se complaint in federal court in 2012. [1]. In 2013, the court stayed the case pending resolution of Johnson's criminal proceedings. [22]. After his release in 2021, Johnson, now represented by recruited counsel, [107], filed an amended complaint, [160].

The amended complaint names Officers Perez, #10546, and Ortoneda, #16168, and Detectives Schleder, #20371, and Garcia, #2055, as defendants.[3] *See id.* It also names "presently unknown Detective/Officer Jane Doe, presently unknown Detective/Officer John Doe" (the "Doe Defendants"), and the City of Chicago. *Id.*

The amended complaint asserts seven counts against all defendants: false arrest (Count I), equal protection (Count II), malicious prosecution (Count III), state-law false imprisonment (Count IV), state-law malicious prosecution (Count V), violation of the Illinois Hate Crime Act (Count VI), and intentional infliction of emotional distress (Count VII). The complaint asserts two counts against the City of Chicago for *respondeat superior* (Count VIII) and indemnification (Count IX).

As the case proceeded through discovery, the parties filed a stipulation of dismissal of all claims as to Officer L.R. Ortoneda. [204]. Pursuant to that stipulation, the court dismissed all claims against Officer Ortoneda with prejudice. [205].

The remaining defendants move for summary judgment. [248]. In his response to defendants' motion for summary judgment, Johnson stated that he would dismiss his false arrest and Illinois Hate Crime Act claims against all defendants. [270] at 14, 26. Johnson also represented that he would dismiss all claims against Officer Perez and the Doe Defendants. *Id.* at 23, 27. But the parties did not file a stipulation of dismissal at that time.

On October 17, 2024, the court scheduled an oral argument on the motion for summary judgment for December 6, 2024. [284]. On December 5, 2024, Johnson filed a motion to withdraw his false arrest and hate crime claims, that is, Counts I and VI, and all claims as they relate to Officer Perez and the Doe Defendants. [285]. The court held oral argument on both the motion for summary judgment and the motion to withdraw claims on December 6, 2024. [286].

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[3] The amended complaint erroneously spells Detective Garcia's name as "Roberto Garoa" and Detective Schleder's name as "Eugene Sohleder." [160]. There is no dispute, however, that the properly named defendants are Detectives Garcia and Schleder.

7

322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 250 (citation, internal quotation marks, and footnotes omitted). Construing the evidence and facts supported by the record in favor of the nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## DISCUSSION

### I. Motion to Withdraw Claims

Defendants argue that Johnson's motion to withdraw certain claims is improper under Federal Rule of Civil Procedure 41. But Rule 41 is not the proper rubric for assessing Johnson's motion to withdraw.

Rule 41(a)(1) provides that a plaintiff may voluntarily dismiss "an action without a court order by filing" either "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment" or "a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1)(A)(i)–(ii).

Rule 41, however, speaks only of dismissal of *an action*, not specific claims. *See Taylor v. Brown*, 787 F.3d 851, 857 (7th Cir. 2015) ("[W]e've said that Rule 41(a) does not speak of dismissing one claim in a suit; it speaks of dismissing an action—which is to say, the whole case." (citations and internal quotation marks omitted)). Rule 41 is "limited to dismissal of an entire action," *id.*, whereas Johnson's motion seeks dismissal of certain claims.

Thus, the court construes Johnson's motion to withdraw claims as a motion to amend the complaint under Rule 15. *See id.* at 858 (construing attempt to voluntarily dismiss some claims as motion to amend the complaint under Rule 15(a)); *Maldonado v. Cnty. of Cook*, No. 20-cv-213, 2020 WL 4365645, at *5 (N.D. Ill. July 30, 2020) ("The proper Federal Rule for dismissal of one count where other counts remain is to consider [it] an amendment under FRCP 15(a)." (citations omitted)).

8

Under Rule 15, a party may amend a pleading as of right either "21 days after serving it," or "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(A)–(B). These deadlines have long passed; Johnson served the amended complaint in July 2022, [160], and defendants filed their answer in August 2022. [164].

"In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, because the deadline to amend the pleadings has passed, *see* [183], Rule 16(b)(4)'s "heightened good-cause standard" applies. *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011).

Under Rule 16(b)(4), the party seeking amendment must first "show good cause for modifying the scheduling order." *Sumrall v. LeSea, Inc.*, 104 F.4th 622, 630 (7th Cir. 2024) (citations and internal quotation marks omitted). Only then does the court decide whether to permit amendment under Rule 15(a)(2). *Id.*

Here, Johnson has not shown good cause for the amendment. The motion was filed almost two years after the deadline to amend the pleadings passed, [183], ten months after discovery closed, [231], and seven months after defendants filed their motion for summary judgment, [248]. Given this timing, the court is not persuaded there is good cause to permit amendment now. *See Alinsky v. United States*, 415 F.3d 639, 648 (7th Cir. 2005); *Clark v. River Metals Recycling, LLC*, No. 3:15-cv-00447, 2018 WL 3108891, at *8 (S.D. Ill. June 25, 2018).

At oral argument, counsel for Johnson explained that he moved to withdraw the claims to simplify the case for the court. This approach is well-taken, and the court commends Johnson's counsel for considering efficiency. Nonetheless, applying the Rule 16(b)(4) good cause standard, the court is not convinced that it should modify its scheduling order to permit amendment now.

Construing Johnson's motion to withdraw as a motion to amend the complaint to withdraw the false arrest and Illinois Hate Crime Act counts and all counts against Officer Perez and the Doe Defendants, the motion is denied. Accordingly, the court addresses the claims asserted in the amended complaint, [160], all of which are challenged by defendants' motion for summary judgment.

## II.     Fourth Amendment Malicious Prosecution

The court grants summary judgment as to Johnson's federal malicious prosecution claim (Count III). The claim is barred by the doctrine of qualified immunity.

"Qualified immunity shields government officials from liability 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their

9

conduct was clearly established at the time of the alleged violation.'" *Davis v. Allen*, 112 F.4th 487, 492 n.3 (7th Cir. 2024) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted). For this reason, qualified immunity focuses on the law that existed at "the time of the challenged conduct." *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010); *see also Wesby*, 583 U.S. at 63 ("The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*'" (emphasis added) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001))); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (asking whether "a reasonable official would understand that what he is doing violates" the Constitution).

Johnson bases his malicious prosecution claim on Garcia and Schleder's actions leading up to the indictments, including ▇▇▇▇▇▇▇▇▇▇ and signing the criminal complaints against Johnson. *See* [270] at 21. Therefore, the relevant dates for qualified immunity in this case are 2012 and 2013, when the evidence was presented before the first and second grand juries.

In 2012 and 2013, the Fourth Amendment right to be free from prosecution without probable cause—that is, the right invoked by a federal malicious prosecution claim—was not clearly established in this Circuit. As early as 2001, the Seventh Circuit rejected the idea that the Fourth Amendment secured a right "not to be prosecuted without probable cause." *See Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001). In 2014, a year after a second grand jury indicted Johnson, the Seventh Circuit again declined to recognize a Fourth Amendment right to be free from prosecution without probable cause. *See Welton v. Anderson*, 770 F.3d 670, 673 (7th Cir. 2014). The Seventh Circuit did the same in 2016. *See Bianchi v. McQueen*, 818 F.3d 309, 323 (7th Cir. 2016).

It was not until *Manuel v. City of Joliet, Illinois*, 580 U.S. 357 (2017)—a case decided nearly four years after Johnson's second grand jury indictment—that the Supreme Court indicated that the Fourth Amendment might imply a right to be free from malicious prosecution.[4] *See id.* at 368 (holding that Fourth Amendment governs a claim for unlawful pretrial detention beyond the start of the legal process). Thus, there was no "settled authority" that would have put Garcia and Schleder on notice

---

[4] In *Thompson v. Clark*, 596 U.S. 36 (2022), the Supreme Court agreed with "most of the Courts of Appeals" in determining that "the most analogous tort to" a Fourth Amendment claim arising out of prosecution without probable cause was malicious prosecution. *Id.* at 43–45. The Court then elaborated on the "favorable termination" element of a cause for malicious prosecution. *Id.* at 44–46. Thus, it is possible that the right to be free from prosecution without probable cause was not clearly established until the Court decided *Thompson* in 2022. But regardless of whether *Manuel* or *Thompson* clearly established the right, the result in this case is the same—qualified immunity forecloses Johnson's malicious prosecution claim.

that their actions violated Johnson's Fourth Amendment right to be free from prosecution without probable cause. *See Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (there must be "some settled authority that would have shown a reasonable officer" that his actions violated the Constitution).

Because Johnson's federal malicious prosecution claim is barred by the doctrine of qualified immunity, the motion for summary judgment is granted as to that claim. As discussed below, in the context of the state malicious prosecution claim, the existence of probable cause also supplies an alternative ground for granting summary judgment on the federal malicious prosecution claim.

### III. State-Law Malicious Prosecution

The court grants summary judgment as to Johnson's state-law malicious prosecution claim (Count V). Under Illinois law, a plaintiff claiming malicious prosecution must prove (1) commencement or continuation of a judicial proceeding, (2) favorable termination, (3) absence of probable cause, (4) malice, and (5) damages. *Hurlbert v. Charles*, 938 N.E.2d 507, 512 (Ill. 2010). Here, Johnson cannot establish the absence of probable cause, nor can he show that the officers acted with malice.

#### A. Probable Cause

No reasonable jury could find the absence of probable cause. Johnson was indicted twice. An indictment creates a presumption of probable cause. *Beaman v. Freesmeyer*, 183 N.E.3d 767, 789 (Ill. 2021). This presumption "may be rebutted by other evidence, such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Id.* (citation omitted).

Here, Johnson does not argue that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ made any false statements to the grand jury. Instead, Johnson contends that ▆▆▆▆ failed to present certain exculpatory evidence before the grand jury. Johnson contends, for example, that the grand jury was not informed that Johnson picked up Mason as part of his ride service, that Johnson always drove with his seat leaned back, that Johnson's window was

---

[5] The parties agree that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. [252] ¶ 110. The parties do not identify any other ▆▆▆▆▆▆▆▆▆▆ who testified or presented evidence to the grand jury. In his response brief, Johnson does not deny that ▆▆▆▆▆▆▆▆▆▆▆▆ testify before the grand jury but contends that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ [270] at 19. However, Johnson does not identify or provide any evidence of the ▆▆▆▆▆▆▆▆▆▆ that he claims were presented before the grand jury. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory allegations, unsupported by specific facts, will not suffice" to defeat summary judgment.).

11

already open when Mason began firing, or that Virgil Johnson did not report seeing the Tahoe stop in front of Ware. *See* [270] at 19–20.

      This argument is not persuasive. First, many of the alleged "facts" that ▮▮▮ failed to disclose were assertions by Johnson himself, including Johnson's claims that he drove with the seat back and that he picked up Mason as part of his ride service. They were not established facts. *Cf. Wesby*, 583 U.S. at 68 ("These cases suggest that innocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect."). Second, ▮▮▮ testimony at the hearing was limited to ▮▮▮ to the grand jury. *See* [254-9] at 3:6–6:20. The ASA did not ask ▮▮▮ questions about what other witnesses (or Johnson) told him. ▮▮▮ Third, "the State has no duty to disclose exculpatory evidence during grand jury proceedings." *See People v. Lang*, 217 N.E.3d 1215, 1220–21 (Ill. App. Ct. 2023) (citations omitted). ▮▮▮ ailure to volunteer either the statements of other witnesses or Johnson's claims about what happened does not show that the indictment was obtained by "improper or fraudulent means." *Beaman*, 183 N.E.3d at 789. Thus, Johnson cannot rebut the presumption of probable cause arising from the grand jury indictments.

      Even without the presumption created by Johnson's indictments, no reasonable juror could find that the charges against Johnson were not supported by probable cause.

      Probable cause is that which would "lead a reasonably cautious person to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Beaman*, 183 N.E.3d at 789 (citations omitted). Prosecutors charged Johnson with first-degree murder on an accountability theory. In Illinois, a person is accountable for the criminal conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c).

      Here, it was reasonable to believe, or "entertain an honest and strong suspicion," *Beaman*, 183 N.E.3d at 789, that Johnson intentionally aided and abetted Tywan Mason in committing first-degree murder.

      Statements Johnson made to police support a finding of probable cause. Johnson falsely told police that he did not know the person he drove that day and that a friend named "Jamel" had asked him to pick up Mason. [252] ¶¶ 69–71, 77, 89. Johnson told police that Mason could not call him to request a ride because Mason did not have a cell phone. *Id.* ¶ 77. But a search of Johnson's phone revealed multiple calls between Johnson and Mason on the day of the incident. *Id.* ¶ 94. Even if, as Johnson claims, only eight of the sixteen calls found in Johnson's phone records reflect actual communications with Mason, the calls on the day of the shooting gave

police reason to believe that Johnson was not telling the truth when he said that Mason did not have a phone. Johnson changed his story several times during his interviews with police and Johnson admits that he told at least one lie during his interviews with Detectives Garcia and Schleder. *Id.* ¶ 88. The "inconsistencies and vagueness" of Johnson's story support a finding of probable cause. *See United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

Circumstantial evidence from the shooting supports a finding of probable cause. The house where Matticx and Junius were shot is on the northwest corner of 54th Street and Hoyne Avenue. [252] ¶ 7. 54th Street runs east-west. Hoyne Avenue runs north-south. Witnesses testified that they saw Johnson's Tahoe driving east on 54th Street toward Hoyne Avenue, i.e. approaching the intersection from the west. [254] ¶¶ 48, 106. As the truck arrived at the intersection, the truck made "a little slant" or partial left turn, as though it were going to turn north onto Hoyne, but stopped at an odd angle near the northwest corner in front of the residence. *Id.* ¶¶ 8, 48–49, 106 (Denton testified that he saw the Tahoe drive down 54th before making a "little slant" like "it wanted to turn" onto Hoyne Avenue, "[but] it wasn't turning."). The victims were in front of the house. [252] ¶¶ 6, 42. Mason fired out the driver's side window (over Johnson) while Johnson leaned back in his seat. *Id.* ¶ 8. The truck then turned back onto 54th Street and continued driving eastbound. *Id.* ¶¶ 15, 19. At some point, Mason exited the vehicle. *Id.* ¶ 10. Johnson drove to his home on Damen Avenue. *Id.* After returning to his home, Johnson did not call the police but instead searched his truck for shell casings. *Id.* These circumstances support a finding of probable cause.

Finally, the statements of Alex Ware support a finding of probable cause. Ware recounted that Johnson pulled up alongside him and pointed a black handgun at him after driving away from the scene of the shooting. Ware suspected that the driver was trying to frighten or harm him to prevent Ware from speaking to police. According to Ware, the driver "must have realized I had seen everything." [254-7] at 12:9. Ware identified Johnson in a lineup as the driver who pointed the black handgun at him. [252] ¶¶ 36–37.

Johnson correctly points out that there were several problems with Ware's testimony. When Ware initially called 911 after the shooting, he failed to mention his encounter with the driver of the Tahoe. And Ware's testimony is in tension with Virgil Johnson's. Virgil Johnson related that he saw the Tahoe driving away from the scene, but he never testified that he saw the Tahoe stop in front of Ware, nor did Virgil Johnson testify that he saw the driver point a gun at anyone.[6] Johnson argues that Ware's inconsistent and uncorroborated testimony is enough to create an issue of fact regarding probable cause. [270] at 19.

---

[6] The Illinois Appellate Court identified similar problems with Ware's testimony. *See Johnson*, 196 N.E.3d at 1028–29.

13

This argument is not persuasive. Even questionable witness accounts can support probable cause. *See Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) ("An officer need not even believe that a witness is reliable to determine that her statement supports probable cause for an arrest because the assessment of credibility rests with courts, not officers." (citation omitted)). "[P]olice officers are constantly faced with reluctant witnesses, recanted confessions, and witness identifications replete with inconsistencies, but the weighing of evidence is for the judge and jury." *Moorer v. City of Chicago*, 92 F.4th 715, 722 (7th Cir. 2024) (citation omitted). The problems with Ware's testimony may support a reasonable doubt as to Johnson's guilt, but they do not negate the existence of probable cause.[7]

In short, Johnson cannot rebut the presumption of probable cause arising from his two indictments. Even if Johnson could overcome the presumption, the evidence against Johnson was enough to "lead a reasonably cautious person . . . to believe, or to entertain an honest and strong suspicion," that Johnson intentionally aided Mason in the commission of first-degree murder. *Beaman*, 183 N.E.3d at 789. Taken as a whole, the evidence supporting probable cause is so one-sided and overwhelming that it would compel any reasonable juror to find probable cause. No reasonable juror could find that the charges were not supported by probable cause.

### B. Malice

Even if Johnson could establish the absence of probable cause, he cannot show malice. "Malice, as an element of malicious prosecution, has been defined as the

---

[7] Johnson cites *Amos v. City of Chicago*, No. 22-cv-1564, 2024 WL 640860 (N.D. Ill. Feb. 15, 2024). In that case, the court denied summary judgment on the plaintiff's state and federal malicious prosecution claims because granting summary judgment would require "accepting the Defendant Officers' version of events as true and disregarding Plaintiff's version of events." *Id.* at *6. In *Amos*, the defendant-officers and the plaintiff gave different accounts of the incident giving rise to the lawsuit. The defendants claimed to have seen the plaintiff flee into a house after adjusting what the defendants thought was a weapon in the plaintiff's waistband. *Id.* at *2. The plaintiff claimed that he stood up and walked into the house rather than attempting to flee. *Id.* After following the plaintiff into the house, the defendants claimed that they saw the plaintiff trying to hide the gun in his couch. *Id.* at *2–3. The plaintiff denied that he had a gun that day and that he was trying to hide anything. *Id.* The defendants claimed that they recovered a handgun at the scene. *Id.* at *5. The plaintiff claimed that no gun was ever recovered. *Id.* Other witnesses testified they never saw a gun that day. *Id.* at *3. And body worn camera footage provided little clarity as to what occurred. *Id.* Authorities later charged the plaintiff with unlawful use of a weapon by a felon. *Id.* But the evidence of the handgun was suppressed after a judge found that officers lacked probable cause to arrest plaintiff. *Id.* The charges were later dismissed via *nolle prosequi*. *Id.* Thus, because of the conflicting accounts and the dearth of evidence of probable cause, the court denied summary judgment on the federal and state malicious prosecution claims. *Id.* at *5–6. Compared to *Amos*, there is far more evidence supporting probable cause in this case. This is not a "he-said, she-said" where the court must accept the defendants' version of events as true to grant summary judgment. Most of the facts are undisputed.

14

initiation of a prosecution for an improper motive." *Beaman*, 183 N.E.3d at 792 (citation omitted). "An improper motive for a prosecution is any reason other than to bring the responsible party to justice." *Id.* (citation omitted).

Johnson contends that he can show malice because he was charged without probable cause. As the court previously explained, there was probable cause. But even if there was not, malice may be inferred from a lack of probable cause only when "the circumstances are inconsistent with good faith by the prosecutorial team and lack of probable cause has been *clearly proved*." *Id.* (emphasis added) (citation omitted).

Here, Johnson has not produced evidence that the officers acted in bad faith, nor can he clearly prove the absence of probable cause. For these reasons, no reasonable juror could find that the officers acted with malicious intent.

*** 

Because Johnson cannot establish the absence of probable cause or malice, the motion for summary judgment is granted as to Johnson's state-law malicious prosecution claim.

## IV. Equal Protection

The court grants summary judgment as to Johnson's equal protection claim (Count II). The crux of this claim is that officers "falsely arrested and unlawfully detained" Johnson because he is an African-American man. [160] ¶ 43. Johnson claims that police unfairly associated him with the Vice Lords gang because of his race despite the absence of evidence connecting him to the crime or any gang-related activity. [270] at 23–24.

To show a violation of the Equal Protection Clause, Johnson must prove that defendants' actions "had a discriminatory effect and were motivated by a discriminatory purpose." *See Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001) (citations omitted).

As evidence of discriminatory intent, Johnson cites a comment by Detective Garcia during his interview on May 11, 2012. While asking Johnson about Mason's intentions on the day of the shooting, Detective Garcia stated: "I just want to know what he [Mason] wanted to do, all right? You're gonna tell me, you know, you're driving Ms. Daisy . . . you have no . . . clue, all right?" [252] ¶ 156; [252-41] at 89:1–6. This was an apparent reference to the film *Driving Miss Daisy*.

But this single comment would not allow a reasonable juror to infer discriminatory intent. Johnson must show that the "decisionmaker[] in his case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (emphasis removed). He must show that the person "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an

15

identifiable group." *Id.* at 298 (citations and internal quotation marks omitted). Garcia's offhand comment does not demonstrate discriminatory intent.

Even if Johnson could show discriminatory intent, he cannot show a discriminatory effect. "Discriminatory effect" means that the defendant treated the plaintiff differently compared to a similarly situated member of an unprotected class. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (citation omitted). Here, Johnson has not produced any evidence that similarly situated members of an unprotected class were or would have been treated differently by Detectives Garcia and Schleder.

Because Johnson cannot establish discriminatory effect or intent, the motion for summary judgment is granted as to Johnson's Equal Protection claim.

## V. Remaining Claims

Johnson's remaining claims are for false arrest under Section 1983, false imprisonment under Illinois law, intentional infliction of emotional distress under Illinois law, violation of the Illinois Hate Crime Act, *respondeat superior*, and indemnification. Summary judgment is granted as to these claims.

Count I asserts a claim of false arrest under federal law. "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (citation omitted). Officer Perez arrested Johnson as Johnson exited his residence on May 10. [252] ¶¶ 29–30. At that time, police had not yet interrogated Johnson. But police had reason to believe that Johnson had driven Mason to the scene. Police also had the statements of Alex Ware, supporting a reasonable inference that Johnson intentionally aided Mason in the commission of the crime. This was "enough information to warrant a prudent person to believe criminal conduct ha[d] occurred." *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (citation omitted). Thus, a reasonable juror could only conclude that there was probable cause to arrest. Summary judgment is granted on Count I.

Because there was probable cause to arrest Johnson, summary judgment is also proper as to Count IV, false imprisonment under Illinois law. *See Poris v. Lake Holiday Prop. Owners Ass'n*, 983 N.E.2d 993, 203 (Ill. 2013) ("Probable cause is an absolute bar to a claim of false imprisonment." (citation omitted)). Summary judgment is granted on Count IV.

Count VI asserts a claim under the Illinois Hate Crime Act, 720 ILCS 5/12-7.1. The Act provides that a person commits an actionable hate crime when:

> by reason of the actual or perceived race . . . of another individual . . . he or she commits assault, battery, aggravated assault, intimidation, stalking, cyberstalking, misdemeanor theft, criminal trespass to

residence, misdemeanor criminal damage to property, criminal trespass to vehicle, criminal trespass to real property, mob action, disorderly conduct, transmission of obscene messages, harassment by telephone, or harassment through electronic communications as these crimes are defined [in the criminal code].

*Id.* Here, as explained above, Johnson cannot show that any of the officers acted "by reason of" Johnson's race. *Id.* Additionally, there is no evidence of any "assault," "intimidation," or any other predicate acts by defendants. Thus, summary judgment is granted as to Count VI.

Count VII asserts a claim for intentional infliction of emotional distress under Illinois law. IIED under Illinois law requires extreme and outrageous conduct that goes beyond all possible bounds of human decency. *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016) (citation omitted). Johnson has not pointed to any such conduct by defendants. Johnson argues that the evidence shows that the defendants "omitted relevant and material facts at key times in the process, particularly before the grand jury." [270] at 26. But as explained above, Garcia, the only defendant who testified at the grand jury proceedings, had no obligation to present such evidence. In any event, the failure to present evidence was not "extreme and outrageous" conduct. Summary judgment is granted as to Count VII.

Counts VIII and IX assert claims for *respondeat superior* and indemnification. But there is no *respondeat superior* or indemnification liability if "the employee is not liable" for any wrongdoing. *See* 745 ILCS 10/2-109. Here, because the officers are not liable for any wrongdoing, neither is the City of Chicago. Summary judgment is granted as to Counts VIII and IX.

Finally, all claims against the Doe Defendants in the amended complaint are dismissed without prejudice. [160]. "Failure to identify a defendant during discovery, and the consequential failure to serve that defendant with process, requires dismissal of the unknown and unnamed defendant." *Frazier v. City of Chicago*, No. 12-cv-9739, 2015 WL 2147678, at *2 (N.D. Ill. May 6, 2015) (citing *Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007)); Fed. R. Civ. P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."). Thus, all claims against the Doe Defendants are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to withdraw certain claims, [285], is denied. Defendants' motion for summary judgment, [248], is granted. Enter final judgment. Civil case terminated.

Dated: March 24, 2025 /s/ Martha M. Pacold